UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | | |
|---|---|---|
| LEDDREW SMITH, JR., | ) | |
| Plaintiff, | ) | |
| | ) | No. 1:10-cv-463 |
| -v- | ) | |
| | ) | HONORABLE PAUL L. MALONEY |
| CITY OF NILES, | ) | |
| Defendant. | ) | |
| | ) | |

## OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Before this Court is Defendant City of Niles's motion for summary judgment. (ECF No. 33.) Plaintiff Leddrew Smith ("Plaintiff"), a former employee of Defendant City of Niles ("Defendant"), filed an amended complaint alleging five employment-related claims. Oral argument on Defendant's motion was heard on September 26, 2011. For the reasons provided below, Defendant's motion is GRANTED.

### STANDARD OF REVIEW

Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories and admissions, together with the affidavits, show there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c); *Tucker v. Tennessee*, 539 F.3d 526, 531 (6th Cir. 2008). The burden is on the moving party to show that no genuine issue of material fact exists, but that burden may be discharged by pointing out the absence of evidence to support the nonmoving party's case. *Bennett v. City of Eastpointe*, 410 F.3d 810, 817 (6th Cir. 2005) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). The facts, and the inferences drawn from them, must be viewed in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (quoting *Matsushita*

*Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  Once the moving party has carried its burden, the nonmoving party must set forth specific facts in the record showing there is a genuine issue for trial.  Fed. R. Civ. P. 56(e); *Matsushita*, 475 U.S. at 574.  The question is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson*, 477 U.S. at 251-252.

## ANALYSIS

Plaintiff was employed by Defendant from 1989, until he was terminated on April 30, 2010. Plaintiff worked in the Records Division of the Utilities Department.  His duties included drafting, billing, Miss Dig, map creation, inspecting water mains and underground and above ground electric projects, and eventually designing water projects.  In 2008, Plaintiff's supervisor, Steve Barnes, retired.  Defendant divided the supervisor's duties among the remaining employees.  Plaintiff filed a complaint with the Equal Employment Opportunity Commission ("EEOC") alleging race discrimination for failure to promote.  In 2010, Defendant terminated Plaintiff when it eliminated the Records Division.  Plaintiff eventually sued Defendant in both state and federal court.  In state court, Plaintiff alleged three race-based state law claims: discrimination for failure to promote, discrimination for termination, and retaliatory termination for filing his EEOC claim.  In federal court, Plaintiff alleged the same race-based claims under federal law, as well as interference and discrimination under the Family and Medical Leave Act ("FMLA").

### A.  RACE CLAIMS AND ISSUE PRECLUSION

Plaintiff filed his state complaint in the Circuit Court for Berrien County.  In state court, Plaintiff brought only discrimination claims under the Michigan's Elliot-Larsen Civil Rights Act. (State Compl. ECF No. 68-1.)  Count I alleged that Defendant failed to promote Plaintiff to the

2

position of Records Engineer on account of Plaintiff's race.  (*Id.*)  Count II alleged that Defendant terminated Plaintiff on account of Plaintiff's race.  (*Id.*)  Count III alleged Defendant retaliated against Plaintiff after Plaintiff filed an EEOC complaint by terminating him.  (*Id.*)  Defendant prevailed in state court on a motion for summary disposition.  (Order Granting Defendant's Mot. for Summary Disposition ECF No. 69-2; Mot. for Summary Disposition Trans. ECF No. 80-1.)

In granting the motion, Judge John Dewane made several factual determinations.  First, Judge Dewane found that there was insufficient evidence to establish any racial animus by Jim Lehmkuhl, then the manager of the Utilities Department. (Trans. 25-26.)  Specifically, the record contained only two isolated remarks made over two years, and the remarks were ambiguous.  (*Id.*)  As part of this first factual determination, Judge Dewane concluded that the decision to abolish Barnes's position was made around March 2007, well before the second remark was made.  (*Id.* 26.)  The record established that the decision was made by Terry Eull, the City Administrator.  (*Id.* 28.)  The record did not support the conclusion that Eull exhibited any racial animus.  (*Id.* 27.)  Second, Judge Dewane found that there was no evidence of pretext.  (*Id.* 28.)  Judge Dewane concluded that the record supported the conclusion that the Utilities Department had financial problems.  (*Id.*)  As a result of declining revenues, the decision was made to eliminate the Records Department.  (*Id.*)  Based on the evidence of financial problems, Judge Dewane concluded that Defendant articulated a nondiscriminatory reason for its decision.  (*Id.* 29.)  Judge Dewane also concluded that Plaintiff was not fired because he filed an EEOC claim.  (*Id.* 29-30.)

Where a state court's resolution of a plaintiff's state law claim requires examining identical operative facts for the plaintiff's federal claims, issue preclusion or collateral estoppel applies. *Hughes v. Gen. Motors Corp.*, 212 F. App'x 497, 501 (6th Cir. 2007).  "[A] federal court must give

to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered." *Id.* (quoting *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81 (1984)).  In Michigan, a court must apply issue preclusion when five factors have been met: (1) the parties in both proceedings are the same or in privity; (2) there was a valid, final judgment in the first proceeding; (3) the same issue was actually litigated in the first proceeding; (4) the issue was necessary to the judgment; and (5) the party against whom preclusion is asserted had a full and fair opportunity to litigate the issue. *Id.* (citing *United States v. Dominguez*, 359 F.3d 839, 842 (6th Cir. 2004)).

Based on Judge Dewane's ruling, Plaintiff's race-based claims, Counts I through III in the amended complaint here, are precluded.  The first three counts here are nearly identical to the three counts in Plaintiff's complaint in state court.  Race discrimination claims under Title VII and Michigan's Elliott-Larsen Civil Rights Act are analyzed under the same standards. *Hughes*, 212 F. App'x at 501 ("In evaluating Hughes's Michigan state law claim of discrimination on the basis of age, sex and race, the Michigan courts use the same *McDonnell-Douglas* burden-shifting paradigm used by the federal courts in evaluating Title VII claims."); *see Dotson v. Norfolk Southern R.R. Co.*, 52 F. App'x 655, 657 (6th Cir. 2002) (involving race claims for disparate treatment, hostile work environment, and retaliation); *Young v. Parke-Davis & Co.*, 884 F.2d 581, 1989 WL98498, at * 3 (6th Cir. Aug. 24, 1989) (unpublished table opinion) (per curiam) ("Michigan courts have thus applied the Title VII standard for establishment of a prima facie case set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973), to race discrimination cases brought under the Elliott-Larsen Civil Rights Act.").  All five preclusion factors are present: the same parties are involved in both proceedings, there was a valid, final judgment in the first proceeding, the same issue was

4

actually litigated in the first proceeding, the issue was necessary to the judgment, and Plaintiff had

a full and fair opportunity to litigate the issue. The fact that Plaintiff has or may appeal the state

court's decision does not alter the conclusion that the issues are precluded. "Michigan and federal

courts agree that an appeal of a judgment does not alter the preclusive effect of the same." *Chaken*

*v. City of Detroit*, 998 F.Supp. 779, 783 (E.D. Mich. 1998).

### B. COUNT IV - FMLA INTERFERENCE

In 2001, Plaintiff injured his back in an automobile accident. (Pl. Ex. 1 and Def. Ex. A - Pl.

Dep. 43; Pl. Ex. 18 - Lehmkuhl April 20, 2006 email.) As a result of his injuries, Plaintiff was

limited in the range of physical activities in which he could participate. (Def. Ex. L - FMLA

Certification 2001.) According to Plaintiff's physician, Dr. Yu, the duration of Plaintiff's incapacity

would be three to four years. (*Id.*) Plaintiff could work forty hours, but would have one or two days

of intermittent episodes of incapacity due to chronic lower back problems. (*Id.*) Plaintiff could not

lift more than thirty pounds, could not walk more than thirty minutes, and was not supposed to bend.

(*Id.*) Defendant accommodated Plaintiff's physical limitations by reassigning some of Plaintiff's

duties, such as Miss Dig and mail runs, to other employees. (Pl. Dep. 43-46; Lehmkuhl April 20,

2006 email.)

In April 2006, Lehmkuhl, initiated a review of Plaintiff's attendance. (Lehmkuhl April 20,

2006 email.) In an email to Cathy Carlisle, Lehmkuhl commented that Plaintiff's

> work attendance is terrible!!!! He has been employed by the City for over 17 yrs. and
> has only accrued 9 days of sick time. He has averaged 14.35 sick days per year. He
> has been employed since 1989, so all the absence time can't be attribute do [sic] the
> vehicle accident in 2001.

(*Id.*) Lehmkuhl also noted that Plaintiff's file contained no medical information since 2002

5

regarding his condition.  (*Id.*)  Five days later, on April 25, 2006, Carlisle sent Plaintiff a letter requesting that he update the information regarding his medical restrictions.  (Pl. Ex. 33 - April 25, 2006 Letter.)  On May15, 2006, Carlisle emailed Lehmkuhl informing him that she received information from Plaintiff's physician.  (Pl. Ex. 34 - Carlisle May 5, 2006 Email.)  Carlisle states, according to Plaintiff's doctor, Plaintiff has the same physical limitations, but the duration of his limitations are now expected to last for his lifetime.[1]  (*Id.*)

On April 15, 2008, Catherine Jackson, a member of the Human Resources Department, sent Plaintiff a letter requesting that his physician complete a recertification of the FMLA Leave form.[2] (Def. Ex. M - Jackson April 15, 2008.)  On a form dated April 18, 2008, Dr. Yu indicates that Plaintiff has chronic lower back problems that are expected to endure for the rest of his life, Plaintiff can work forty hours a week, and that Plaintiff may have intermittent episodes of incapacitation lasting one or two days.  (Def. Ex. M - FMLA Certification 2008.)  Plaintiff was restricted from lifting more than thirty pounds, from walking more than thirty minutes, and from bending.  (*Id.*)

On February 12, 2009, Jackson emailed Plaintiff requesting recertification of Plaintiff's FMLA Leave form.  (Pl. Ex. 36 - Jackson Feb. 12, 2009 Email.)  Plaintiff submitted his certification form on May 4, 2009.  (Pl. Ex. 37 - FMLA Certification May 2009.)  Plaintiff's work restrictions remained the same.  However, Dr. Yu estimates that Plaintiff would experience intermittent episodes of incapacity every three months with a duration of one day.  (*Id.*)

---

[1]Carlisle summarizes the restrictions as "no lifting 30 lbs or more, no walking for more than 30 minutes, no bending."  (Carlisle May 5, 2006 Email.)  The documents received from Plaintiff's physician are not included in the record.

[2]The parties have intimated that Carlisle and Jackson are the same person.  Whether they are the same person or two different people does not affect the motion.

On October 30, 2009, Jackson emailed Plaintiff about his recent absences.  (Def. Ex. N -
Jackson Oct. 30, 2009.)  In the email, Jackson notes that Plaintiff had taken time off from work for
his back on six occasions between May 18 and October 12, 2009.  (*Id.*)  Jackson asks Plaintiff to
have his doctor complete another FMLA certification form because the absences were exceeding the
absences estimated in the 2008 certification form.  (*Id.*)  On November 12, 2009, Plaintiff submitted
another FMLA certification form.  (Def. Ex. P - FMLA Certification Nov. 2009.)  The restrictions
remained the same, but this time Dr. Yu states that Plaintiff would be incapacitated for two or three
days each month due to his chronic condition.  (*Id.*)  On November 20, 2009, Jackson emailed
Plaintiff a request for permission to speak with Dr. Yu.  (Def. Ex. O - Jackson Nov. 20, 2009 Email.)
Plaintiff declined to grant permission to speak with his doctor.  (*Id.*)

On February 9, 2010, Lehmkuhl sent Plaintiff, and several others, an email about picking up
mail from the Post Office.  (Pl. Ex. 22 - Lehmkuhl Feb. 9, 2010 Email.)  Lehmkuhl explains that,
when Jim Shipley, the other employee in the Records Division, was absent from work, Plaintiff
needed to pick up the mail.  (*Id.*)  Because Shipley would not be at work the next day, Lehmkuhl
informs Plaintiff he would need to pick up the mail.  (*Id.*)  After receiving the email, Plaintiff visited
Lehmkuhl to discuss the matter. (Pl. Dep. 194-95.)  According to Plaintiff, Lehmkuhl acknowledged
Plaintiff's restrictions on lifting more than thirty pounds and told Plaintiff that if he needed to make
more than one trip, Plaintiff still needed to pick up the mail.  (*Id.*)  Plaintiff picked up the mail on
February 10, 2010.  In doing so, Plaintiff aggravated his back injury.  (Pl. Ex. 23 - Incident Report
Feb. 12, 2010.)  At his deposition, Plaintiff admitted that the incident on February 10, 2010, was the
only time he was asked to perform a task allegedly outside of the restrictions in his FMLA
certification.  (Pl. Dep. 182-83.)

On February 11, 2010, Lehmkuhl sent an email to Eull expressing his frustration with

Plaintiff.  (Pl. Ex. 32 - Lehmkuhl Feb. 11, 2010 Email.)  Lehmkuhl wrote the following:

> This "**pisses me off**".  I assigned Drew Smith yesterday to be Jim Shipley's back up
> for picking up our mail at the Post Office.  He initially complained saying that Steve
> Barnes had removed him from this duty because of this back problems [sic].  I simply
> told him that his restriction was a limit of 30# and if the mail was heavier than that
> he should make multiple trips between the Post Office and his vehicle.  So he
> reluctantly carried out his duty yesterday (Jim Shipley was on funeral leave.)
>
> Now today I get a voice mail message on my phone from Drew that he has back
> problems from picking up the mail yesterday and won't be into work ! ! ! !
>
> **I can't believe it ! ! !**

(*Id.*) (emphasis in original).  Plaintiff was asked about his conversation with Lehmkuhl at his

deposition.  Plaintiff provided the following answers.

> Q.  What did he say?
> A.  When he said - - I was the one that asked him.  I said, how am I supposed to
> know what's over 30 pounds?  I said, I'm not supposed to be doing any bending or
> stooping or squatting or pulling.
>     And he said, all your restrictions say is that you are not to lift 30 pounds.  He
> said make multiple trips.
>     I said, how am I supposed to weigh the mail?  There is no way to weigh the
> mail upstairs, or over at City Hall, or at the Post Office.
>     And that's when he said, do whatever you got to do, make multiple trips.

(Pl. Dep. 195.)  Plaintiff was also asked about how he performed the task of picking up the mail.

> Q.  Okay, so you picked up all the mail and brought it all in one trip?
> A.  Yes.
> Q.  You didn't make any attempt to make a couple of trips to guarantee that it wasn't
> in excess of 30 pounds?
> A.  There was no way for me to know what 30 pounds was.  There was no way to
> measure it.
> Q.  You could have divided it in half just to, and made that extra trip just to be
> cautious, couldn't you?
> A.  I could have probably went back 100 times and got one piece of mail at a time
> too.
> Q.  Would you have done that?

A. I could have.

Q. Okay.

A. But I didn't.

Q. Did you think of doing that?

A. No. I don't think it would be real productive.

Q. Well you could have made two trip?

A. I could have made several trips?

Q. And you could have made two?

A. I could have made twenty.

Q. But you decided to make only one trip?

A. Yes.

Q. Do you have any idea how many pounds the mail weighed that day?

A. None whatsoever.

Q. Okay.

A. There was no way to measure or weigh the mail that Jim Lehmkuhl told me to go and retrieve.

Q. In looking at the mail, did it seem to you that it was close to 30 pounds?

A. I can't look at a box full of mail and tell you how much it weighs, sir.

Q. So you didn't know how much the mail weighed?

A. Exactly.

Q. So you thought, I'll just bring it all in one shot and don't worry about making the multiple trips, right?

A. I did what Jim Lehmkuhl told me to and I went and got the mail.

Q. Well Jim Lehmkuhl told you if it was going to be too much, make more than one trip, right?

A. Yes.

Q. You didn't do that, did you?

A. No.

(Pl. Dep. 198-200.)

On March 3, 2010, Dr. Yu, on Plaintiff's behalf, sent a letter to Lehmkuhl. (Pl. Ex. 29 - Yu March 3, 2010 Letter.) In the letter, Dr. Yu reiterates Plaintiff's physical restrictions, and added several new restrictions. (*Id.*) Dr.Yu opines that Plaintiff should not be lifting, pulling, or pushing greater than 20 pounds frequently or 30 pounds occasionally, should not be repetitively bending or twisting at the waist, should not be doing extended reaching beyond 90 degrees in both arms, no squatting, kneeling, or bending, and no prolonged standing or walking for more than 30 minutes.

9

(*Id.*)  On March 17, 2010, Jackson emailed Plaintiff about the letter from Dr. Yu.  (Pl. Ex. 30 - Jackson March 17, 2010 Letter.)  Jackson explained that because the letter contained new restrictions, Plaintiff needed to submit a new FMLA Leave form.  (*Id.*)  Dr. Yu completed a new form on April 5, 2010.  (Pl. Ex. 31 - FMLA Certification April 2010.)

Under the FMLA, qualifying employees are entitled to twelve weeks of unpaid leave each year if, among other things, the employee has a "serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D).  *See Cavin v. Honda of America Mfg., Inc.*, 346 F.3d 713, 719 (6th Cir. 2003).  There are two theories of recovery under the FMLA, an interference or entitlement theory and a retaliation or discrimination theory.  *Hunter v. Valley View Schs.*, 579 F.3d 688, 691 (6th Cir. 2009); *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 707 (6th Cir. 2008).  The interference or entitlement theory finds a basis in 28 U.S.C. § 2615(a)(1), which provides that "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise or attempt to exercise, any right provided under [the FMLA]."  *See Daugherty*, 544 F.3d at 707.

In order to qualify for FMLA, an employee must submit documentation to the employer establishing his or her need.  *See* 29 C.F.R. § 825.305(a) (certification).  Absent some specific conditions set forth in the regulation, "[a]n employer may request recertification no more than every 30 days and only in connection with an absence by the employee." 29 C.F.R. § 825.308(a).  If the duration of the employee's condition will last more than 30 days, the employer must wait until that minimum duration expires before requesting recertification.  *Id.* 825.308(b).  However, even when the condition is expected to endure for more than six months, the employer may request recertification every six months, in connection with an absence.  *Id.*  An employer may request

recertification less than 30 days after the previous certification if the circumstances described by the "previous certification have significantly changed (e.g., the duration or frequency of the absence, the nature or severity of the illness, complications)." *Id.* § 825.308(c)(2).

> For example, if a medical certification stated that an employee would need leave for one or two days when the employee suffered a migraine headache and the employee's absences for his or her last two migraines lasted for four days each, then the increased duration of absence might constitute a significant change in circumstances allowing the employer to request a recertification in less than 30 days.

*Id.*

To establish a claim under the interference theory, a plaintiff must show (1) he or she was an eligible employee, (2) the defendant was an employer, (3) the employee was entitled to leave under the FMLA, (4) the employee gave the employer notice of his or her intention to take leave, and (5) the employer denied the employee benefits to which he or she was entitled. *Cavin*, 346 F.3d at 719. The fifth element may be established by showing that the employer used, in an unlawful manner, the employee's use of FMLA leave. *Wyson v. Dow Chem. Co.*, 503 F.3d 441, 447 (6th Cir. 2007).[3] At the prima facie stage, the plaintiff's evidentiary burden is minimal. *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007) ("[A]ll the plaintiff must do is put forth some credible evidence that enables the court to deduce that there is a causal connection . . . .").

### 1.  REQUESTS FOR FMLA RECERTIFICATION

As part of Count IV, Plaintiff asserts Defendant's repeated requests for recertification of his FMLA form constitutes interference with his rights under the statute.

------

[3]Although the Sixth Circuit Court of Appeals has neither endorsed nor rejected the theory, other circuit courts have discussed an interference claim in terms of an employer chilling or discouraging an employee from using his or her rights under the FMLA. *See, e.g., Estrada v. Cypress Semiconductor (Minnesota) Inc.*, 616 F.3d 866, 871 (8th Cir. 2010).

Plaintiff has not established a prima facie case for interference with FMLA benefits on the basis of the requests for recertification. Defendant was authorized to request recertification in each instance. Plaintiff cannot identify a single benefit that was denied as a result of the requests. Under the federal regulations, an employer may request FMLA recertification under certain conditions. Those conditions, as outlined in 29 C.F.R. § 825.308, are met here. Without dispute, the duration of Plaintiff's condition on each FMLA certification form exceeds six months. Because the duration of the condition was for a period exceeding six months, Defendant could only ask for recertification every six months, and in connection with an absence. *See* 29 C.F.R. § 825.308(b). On April 25, 2006, Carlisle asked Plaintiff for an update on the medical restrictions imposed in 2001. It is not clear from the record whether Dr. Yu submitted an FMLA form, or simply sent a letter to Defendant. However, in the information provided, Dr. Yu changed the duration of Plaintiff's restrictions from three to four years to his lifetime. This lifetime duration remains the same on all subsequent forms. Two years later, on April 15, 2008, Jackson requested Plaintiff complete a recertification. The form, dated April 18, 2008, indicates Plaintiff would have one to two day intermittent episodes. The form did not indicate how often those episodes would occur. Jackson asked Plaintiff for recertification on February 12, 2009. On this recertification form, dated May 4, 2009, Dr. Yu indicated that Plaintiff could expect to be incapacitated for one day every three months. These first three requests for recertification occurred well beyond the six month period allowed for under the regulation.

Jackson next asked Plaintiff for recertification on October 30, 2009. This request was made less than six months, about five months and three weeks, after the previous certification documents were submitted. An employer is allowed to request recertification less than thirty days after the previous certification if the circumstances described by the previous certification have "changed

12

significantly." 29 C.F.R. § 825.308(c)(2). The regulation does not define the phrase "changed significantly," but it does offer examples, including the duration or frequency of the illness. *Id.* Here, Plaintiff had taken time off from work on six occasions, four more than were anticipated by the May 4, 2009 certification. Therefore, the October 30 request did not violate the regulation. Dr. Yu completed the certification form on November 12, 2009, increasing the length and frequency of Plaintiff's intermittent incapacitation.

Jackson next asked for recertification on March 17, 2010. This request was made less than six months, about four months, after the previous certification documents were submitted. This request was authorized by the regulation because Dr. Yu sent a letter to Defendant on March 3, 2010 altering the physical limitations provided on the November 12, 2009 certification form.

Plaintiff advances several other arguments, none of which require a different conclusion. Plaintiff argues, even if the requests were authorized, Defendant's motivation for the requests was not proper. Plaintiff has not identified any authority to support this theory. Plaintiff's theory finds no basis in the language of the regulation. Neither has Plaintiff cited to any portion of the record suggesting that Defendant had any improper motive. On the other hand, Defendant has identified specific reasons for each of the requests for recertification. To the extent that Plaintiff suggests the recertification requests are evidence of his discrimination claims, those claims are discussed elsewhere.

### 2. WORK ASSIGNMENT IN VIOLATION OF WORK RESTRICTIONS

As part of Count IV, Plaintiff alleges he was told to perform a task that included activity that violated the physical restrictions specified in his FMLA Leave forms.

Plaintiff cannot establish a prima facie case for interference based on being assigned the task

13

of picking up the mail.  First, Plaintiff has not established that the work assignment violated any of
his physical restrictions or limitations.  Nowhere in the record is the weight of the mail established.
In order to violate his work restrictions, Defendant would have had to direct Plaintiff to lift more
than thirty pounds.  Second, the record establishes that Plaintiff was told to make as many trips as
would be necessary to pick up the mail in order to accommodate his restriction on lifting.  Plaintiff
opted to perform the task in one trip, rather than multiple trips.  The fact that other employees could
have been assigned the task does not establish that the task of picking up the mail violated Plaintiff's
work restrictions.

Plaintiff's other arguments are similarly unsupported in the record.  Plaintiff argues, even if
he could make multiple trips, those multiple trips would have involved excessive walking, including
up and down stairs.  The record does not establish the distance Plaintiff would have had to walk or
that Plaintiff had to travel up and down stairs in order to pick up the mail.  Plaintiff was restricted
from walking in excess of thirty minutes.  The record does not establish how many minutes a single
trip would take.

## C. COUNT V- FMLA DISCRIMINATION

Steve Barnes, Plaintiff's supervisor until 2008, worked for Defendant as Records Engineer
for thirty years.  (Pl. Ex. 40 - Barnes Dep. 6-7.)  Prior to becoming Records Engineer, Barnes worked
as the Records Engineer Aide for ten years.  (*Id.* 7.)  Barnes replaced John Marx, who was the
Records Engineer Assistant, until Marx retired.  (*Id.*)  At some point during his tenure, Barnes's title
changed from Records Engineer Assistant to Records Engineer.  (*Id.* 21.)  The title change was
largely honorary.  (*Id.*)  Barnes hired Plaintiff for the position of Records Engineer Aide.  (*Id.* 11.)

14

In March 2000, Defendant's Personnel Manual contained provisions for promotions and transfers.  (Def. Ex. B - 2000 Personnel Manual.)  Article XII outlined the procedures for promotions and transfers.

> It is the policy of the City to fill vacancies whenever possible by promotion from within.  It is sometimes necessary or desirable to employ persons from outside the City staff for positions, which require special experiences or skills.  Transfers or promotions are based on many factors, including the ability to do the work.  All applications will be given due consideration.

(Personnel Manual 12.1 A.)  This portion of the Personnel Manual was eliminated in 2006.  (Pl. Ex. 11 - Eull Dep. 27-28.)  The 2006, 2008, 2009, and 2010 Personnel Manuals do not include the particular provision.  (*Id.* 27.)

Barnes provided Defendant with notice of his pending retirement approximately one year or more before retiring.  (Def. Ex. B - Lehmkuhl Dep. 34-35; Pl. Ex. 40 - Barnes Dep. 19.)  Eull decided to eliminate Barnes's position.  (Eull Dep. 100.)  Barnes testified at his deposition that Lehmkuhl indicated Plaintiff would not be getting Barnes's position because Lehmkuhl "would be crucified if he gave [Plaintiff] the job."  (Barnes Dep. 25.)  Meetings were held to identify the tasks Barnes performed.  (Lehmkuhl Dep. 36, 249-50; Barnes Dep. 28-31; Pl. Ex. 19 - Morse Dep. 26-27.)  Plaintiff participated in those meetings.  (Lehmkuhl Dep. 249.)  It was not made clear at those meetings that Barnes would not be replaced.  (Morse Dep. 27-28.)  A spreadsheet was developed to identify Barnes's duties and to divide those tasks among employees.  (Def. Ex. H - Spreadsheet; Lehmkuhl Dep. 250 ; Pl. Ex. 39 - Shipley Dep. 46.)  The assignment of Barnes's duties was made known to everyone affected more than six months before Barnes retired.  (Barnes Dep. 30.)  When Barnes retired, Plaintiff was not promoted to Barnes's position.  The position of Records Engineer was eliminated.  (Lehmkuhl Dep. 37, 70.)  The money for Barnes's position was used to hire a

second Information Technology ("IT") employee.  (Lehmkuhl Dep. 70-71; Eull Dep. 106-07.)
Defendant's 2007-08 Budget reflects that Barnes retired and was not replaced.  (Def. Ex. G.)

At some point, Eull made the decision to eliminate the Records Division of the Utility
Department. (Eull Dep. 143-44.) Defendant has been going through a reduction-in-force for the past
four or five years caused by budget and economic problems.  (*Id.* 173.)  The Utility Department is
financed by rates, which are paid by people who use the utilities.  (*Id.* 47.)  Factories had recently
closed and there had been a reduction in utility usage.  (*Id.*)  Even though rates had been increased,
the Utility Department was losing money.  (*Id.*)  The Records Division consisted of Plaintiff and Jim
Shipley.  Eull testified that he made the decision because neither position in the Records Division
was necessary.  (*Id.* 151.)  The two were presented with severance packages on April 12, 2010.  (Def.
Exs. J and K.)  The two agreements are substantially identical, with differences reflecting the
differences between the length of time each worked for Defendant.  (*Id.*)  The last day of work for
both men was April 13, 2010, with salary paid through April 30, 2010.  (*Id.*)

The FMLA retaliation or discrimination theory finds a basis in 28 U.S.C. § 2615(a)(2), which
provides "[i]t shall be unlawful for any employer to discharge or in any other manner discriminate
against an individual for opposing any practice made unlawful by [the FMLA.]."  *See Daugherty*,
544 F.3d at 707.  A plaintiff may establish an FMLA discrimination or retaliation claim by either
direct or circumstantial evidence.  Where an employee offers indirect or circumstantial evidence of
discrimination in order to establish a prima facie case, the employee must show (1) he or she
engaged in a statutorily protected activity, (2) he or she suffered an adverse employment action, and
(3) a causal connection between the protected activity and the adverse employment action.
*Daughtery*, 544 F.3d at 707 (citing *Bryson v. Regis Corp.*, 498 F.3d 561, 570 (6th Cir. 2007)).

Proximity in time between the protected activity and the adverse employment action, combined with some other indicia of prohibited conduct, can constitute indirect evidence of a causal connection in retaliation suit. *Dixon*, 481 F.3d at 333-34.

For a retaliation claim, when a plaintiff presents evidence of a prima facie case using circumstantial evidence, courts apply the familiar burden-shifting analysis. *Bryson*, 498 F.3d at 570; *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 315 (6th Cir. 2001). After Plaintiff presents a prima facie case, the burden shifts to the defendant to proffer a legitimate, nondiscriminatory explanation for the employment decision. *Bryson*, 498 F.3d at 570. In the third stage of the burden-shifting analysis, a plaintiff is given the opportunity to demonstrate the employer's proffered reason for the adverse employment action is pretextual any of three ways: (1) showing the proffered reason was false; (2) showing the proffered reason was insufficient to cause the adverse action; or (3) showing the proffered reason was not the actual reason for termination. *Joostberns v. United Parcel Servs., Inc.*, 166 F. App'x 783, 794 (6th Cir. 2006) (unpublished) (citing *Manzer v. Diamond Shamrock Chems. Inc.*, 29 F.3d 1078, 1084 (6th Cir. 1994)). In a reduction-in-force ("RIF") situation, the RIF is a legitimate, nondiscriminatory reason for an adverse employment decision. *Bell v. Prefix, Inc.*, 321 F. App'x 423, 428 n.1 (6th Cir. 2009). However, in a RIF situation, the employer must specify why this particular employee, as opposed to any other employee, was terminated. *Id.* at 428 (collecting cases and applying the holdings to FMLA claims).

## 1. FAILURE TO PROMOTE IN 2008

In Count V, Plaintiff alleges he was not promoted in 2008 to the position of Records Engineer because of his use of FMLA leave.

Plaintiff has presented sufficient evidence to establish a prima facie case for FMLA

17

retaliation for failure to promote in 2008. The record establishes that Plaintiff qualified for FMLA intermittent leave as early as 2001 and exercised that leave on an irregular, but steady, basis. In other words, Plaintiff engaged in a statutorily protected activity. The record establishes that Plaintiff suffered an adverse employment action in both 2008, when he was not promoted to the position of Record Engineer. Given the minimal proof necessary at the prima facie stage, Plaintiff has presented sufficient evidence to establish the causal connection element of a prima facie case. There is evidence that, in April 2006 in an email, Lehmkuhl made a negative comment about Plaintiff's attendance and his use of leave. Judge Dewane determined that the decision not to promote Plaintiff was made around March 2007. Although the proximity between Lehmkuhl's comment and the adverse employment decision is not immediate, taking the evidence in the light most favorable to Plaintiff, there is enough evidence for a causal connection to be implied.

Defendant has, however, presented a legitimate, nondiscriminatory reason for its decision not to promote Plaintiff. Barnes was not replaced; his position was eliminated. If the position did not exist, Plaintiff has no claim that it was discriminatory not to promote him. Plaintiff has no evidence that the decision to eliminate the position was based on Plaintiff's use of FMLA leave. Second, Judge Dewane determined Terry Eull, not Lehmkuhl, made the decision to eliminate the position of Records Engineer. There is no evidence that Eull was motivated to retaliate against Plaintiff for Plaintiff's use of FMLA leave. Finally, Defendant had eliminated the prior policy favoring promotion of individuals from within departments. The record does not support the conclusion that the policy was eliminated in order to avoid promoting Plaintiff.

Plaintiff has not produced any evidence to establish that Defendant's proffered reasons are false, insufficient, or not the actual reason for the decision not to promote Plaintiff.

## 2.  TERMINATION IN 2010

As part of Claim V, Plaintiff alleges he was terminated in 2010 because of his use of FMLA leave.

Plaintiff has presented sufficient evidence to establish a prima facie case for retaliatory termination in 2010.  Plaintiff participated in protected activity by taking FMLA leave.  Plaintiff suffered an adverse employment action when he was terminated.  Defendant made three requests in 2008 and 2009 and two requests in 2010 for Plaintiff to recertify his FMLA status.  Given the minimal burden at the initial stage, the temporal proximity of those requests with Plaintiff's termination are sufficient to establish a causal connection.

Defendant, however, has presented sufficient evidence of a legitimate, nondiscriminatory reason for Plaintiff's termination.  Defendant, especially the Utility Department, was in financial hardship.  A financial decision was made to eliminate the entire Records Division, which included Plaintiff and Shipley.  The record does not establish that Shipley was taking FMLA leave.  The fact that two individuals were terminated undermines Plaintiff's claim that he was terminated for using FMLA leave.  Defendant has justified the decision to eliminate the Records Division, neither position was essential to the Utilities Deparatment.

Plaintiff has not produced any evidence to establish that Defendant's proffered reasons are false, insufficient, or not the actual reason for the decision to terminate Plaintiff.  Defendant's requests for recertifications were within the bounds of the federal regulations.  Where the recertification requests occurred within six months of the previous request, Plaintiff had either exceeded the expected intermittent leave (May-October 2009) or the condition on his physical limitations had been altered by Dr. Yu (November 2009-March 2010).  In addition, Lehmkuhl was

19

the individual who questioned Plaintiff's use of leave, but Eull made the decision to eliminate the positions.  Plaintiff argues the record supports the conclusion that Shipley was terminated in order to make Plaintiff's termination legitimate.  At his deposition, Shipley testified that he heard from other individuals that he was terminated to make Plaintiff's termination legitimate.  (Shipley Dep. 24-25.)  Plaintiff testified that Shipley told Plaintiff what Shipley had heard.  (Pl. Dep. 242-43.) Both statements are hearsay under Fed. R. Evid. 801(c) and do not fall within any exception.  If offered for the truth of the matter, statements are inadmissible and cannot be considered as part of the motion for summary judgment.  *See Dole v. Elliott Travel & Tours, Inc.*, 942 F.2d 962, 968 (6th Cir. 1991).

## CONCLUSION

Defendant City of Niles is entitled to summary judgment on all claims in Plaintiff's amended complaint.  Plaintiff's race claims are subject to issue preclusion as the same claims were resolved against him in state court.  Plaintiff has not established a prima facie case for his FMLA interference claims.  Although Plaintiff may be able to establish a prima facie case for his FMLA discrimination claims, Defendant has put forth sufficient evidence to support its legitimate, nondiscriminatory reasons for the employment decisions.  Plaintiff has not established that those reasons were pretextual.

## <u>ORDER</u>

For the reasons provided in the accompanying opinion, Defendant City of Niles's motion for summary judgment (ECF No. 33) is **GRANTED.**    Plaintiff Leddrew Smith's claims against Defendant City of Niles are **DISMISSED WITH PREJUDICE.**

**IT IS SO ORDERED.**


Date:    September 29, 2011                                    ___/s/ Paul L. Maloney___
                                                              Paul L. Maloney
                                                              Chief, United States District Judge